IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GABRIEL HEAD, GARY WARE,       )
HENNIS WASHINGTON, and         )
TIMOTHY CALDWELL,              )
                               )
    Plaintiffs,                )
                               )
v.                             )          CIVIL ACTION NO. 1:09cv187-WHA
                               )
PITTS ENTERPRISES, INC.        )                    (WO)
                               )
    Defendant.                 )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by Defendant Pitts

Enterprises, Inc. ("Pitts") (Doc. #32).

This case concerns four Plaintiffs – Gabriel Head ("Head"), Gary Ware ("Ware"),

Hennis Washington ("Washington"), and Timothy Caldwell ("Caldwell") – who each bring

multiple claims against Pitts for violations of 42 U.S.C. § 1981.  For the reasons to be

discussed, the Motion for Summary Judgment is due to be GRANTED in part and DENIED in

part.

### II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III.  FACTS

The submissions of the parties establish the following facts, viewed in a light most favorable to the non-movants:

2

**A. Hostile Work Environment**

All four Plaintiffs – Head, Ware, Washington, and Caldwell – are black males who each allege that Pitts subjected him to a hostile work environment. For the most part, each Plaintiff's hostile work environment claim is based on the following set of facts:

**1. Management of Pitts Enterprises, Inc.**

Pitts Enterprises Inc. is in the business of building tractor trailers. During the events forming the basis of this lawsuit, Jeff Pitts was the owner, Danny Jacobs was a supervisor, Jimmy Hudson was a supervisor, Billy Copeland was an assistant supervisor or "lead man" as well as a supervisor, Bill Breeden was a plant manager, who had authority over supervisors, and Les Quay was Breeden's successor as plant manager. All of these individuals are white. Anthony Williams and Michael Bryant are white co-employees of the four black Plaintiffs.

**2. The Hiring and Suspension of Anthony Williams**

Danny Jacobs ("Jacobs"), a white supervisor at the Pitts facility, hired Anthony Williams ("Williams"), a white male, on August 11, 2008. When Jacobs hired Williams, Plaintiff Caldwell told Jacobs that he had worked with Williams before and thought that he was a racist. Billy Copeland, a white "lead man" working under Jacobs, knew at the time Jacobs hired Williams that Williams did not like blacks. Jacobs hired Williams despite Caldwell's protest.

Eight days after Williams was hired, on August 19, 2008, Williams was suspended for three days for using racially derogatory language. The suspension was based on comments that Williams made to Bobby Jo Parsons ("Parsons"), a white female co-worker. Williams told Parsons that he had told Jacobs, "Don't put me with that mother fucking Tim Caldwell" or

"these other niggers." (Doc. #32-17, Caldwell Dep. 61:16-22; Doc. #32-14, Washington Dep. 48:14-49:1.)  Parsons told Caldwell, Washington, and Michael Lindsay, another black employee, about Williams' comments.[1]  Caldwell, along with Ware and Washington, complained to Jacobs about Williams' comments.  Caldwell asked Jacobs to do something about Williams because he thought it was too dangerous working in the plant with someone who harbored negative attitudes toward black employees.  According to Ware, Washington, and Caldwell, Jacobs expressed some disbelief that Williams even made the comment because Parsons has "a kid by a black man" and consequently "her words do not matter." (Doc. #32-16, Ware Dep. 82:4-19; Doc. #32-17, Caldwell Dep. 61:23-62:17.) Ware interpreted this comment as insulting Parsons as well as black employees in general.  (Id. 82:8-16.)  Caldwell also reported Williams' comments to Copeland, who responded, in effect, that Williams had always harbored negative attitudes towards blacks because "that's just the way he is." (Doc. #32-17, Caldwell Dep. 63:7-12.)

Jacobs later confronted Parsons in front of Caldwell, and Parsons told Jacobs that Williams did in fact make the comment.  Jacobs then suspended Williams for three days on August 19, 2008 for using racially offensive language, and told Williams that if it happened again, he would be terminated.  Billy Copeland, a supervisor directly under Jacobs, testified

---

[1]  In Washington's brief, he contends that Williams directly told him that he did not want to work with "no niggers." (Doc. #67 at 74.)  Despite this statement made by Plaintiffs' counsel, however, the record deposition excerpts cited do not support that assertion.  Rather, the record indicates that Williams made the remark to Parsons, who in turn told Plaintiffs.  (Doc. #32-14, Washington Dep. 48:17-23, 49:2-3) (Doc. #32-17, Caldwell Dep. 66:23-67:3.)

The court also notes that, when citing to the page numbers of Plaintiffs' Consolidated Brief (Doc. #67), the court uses the CM/ECF page numbers at the top of the page.

that, after Williams returned from the suspension, he continued to use racially offensive language.  Ware has testified that Williams has never been assigned to work with a black employee.  (Doc. #32-16, Ware Dep. 80:25-81:14.)

### 3.  Confederate Flag Paraphernalia

Williams wore a Confederate bandana and displayed a Confederate flag sticker on his welding shield every day.  Copeland, Williams' assistant supervisor at the time, knew about this Confederate paraphernalia, and also knew that Caldwell and others had complained about Williams wearing Confederate flag paraphernalia.  Copeland spoke to Jacobs about the tension surrounding the Confederate flag displays.  Copeland also talked to Williams about it, but Williams said he was not going to peel the Confederate flag from his welding helmet or remove his bandana unless they fired him.  Copeland does not think that Williams ever took the Confederate flag sticker off his helmet.  Danny Jacobs also saw Confederate flags on Tony Williams' welding helmet.

Washington complained to Jacobs, Hudson, Stacey Nelson, and every other supervisor about Williams, Bryant, and other white employees wearing Confederate flag paraphernalia. (Doc. #32-14, Washington Dep. 35:18-37:21.)  No action was taken as a result of Washington's complaints, and the white employees continued to wear Confederate flag paraphernalia. (Id. at 38:17-23.)

Caldwell saw the Confederate flag on Williams and Bryant's helmets and complained to Jacobs about it.  (Doc. #32-17, Caldwell Dep. 67:20-68:1.)  The Confederate flag was never removed from the helmets.  (Id. at 68:11-14.)

Head observed Williams wearing Confederate flag paraphernalia, and observed Bryant displaying Confederate flag stickers on his car in the parking lot.  (Doc. #32-15, Head Dep. 98:1-16; 108:11-19.)  Head complained about his white co-workers use of racially offensive language and the Confederate paraphernalia, but nothing was done to stop it.  (Id. 133:9-15; Doc. #48-5, Copeland Dep. 55:20-56:4, 56:5-16.)

### 4.  Complaints of Marijuana Use at Work

Caldwell, Washington, and Ware complained to Jacobs that Williams and Bryant were smoking marijuana on breaks.  Caldwell complained to Jacobs that the marijuana use, in combination with the racist attitudes held by Williams and Bryant and the physical nature of the work at the plant, created a dangerous workplace environment:  Caldwell was concerned that Williams and Bryant posed a danger to black employees because they were coming to work high on marijuana, performing physical tasks such as lifting trailers, and all the while harboring negative attitudes toward black people.  Caldwell asked Jacobs to do something about the situation.  (Doc. #32-17, Caldwell Dep. 64:1-16.)

### 5.  The Penis Incident

The complaints of marijuana use, the controversy surrounding the wearing of Confederate flags, and the general tension at the plant eventually led to a heated exchange between Ware, Caldwell, Williams, and Bryant.  While walking to the break room at the Pitts facility, Ware and Caldwell exchanged words with Williams and Bryant:  Bryant said to Ware and Caldwell, "I'm fixin' to go take a big fat piss; do one of y'all wanna hold my dick?"  (Doc. #32-16, Ware Dep. 76:16-77:20; Doc. # 32-17, Caldwell Dep. 63:17-65:23, 77:11-13.)  Ware asked Bryant to whom his comments were directed, and Bryant repeated himself and

6

started laughing.  Ware reported the incident to Billy Copeland, a supervisor at the time, and Copeland asked Williams what was said.  Williams revealed the comment, and added that he was tired of the black employees complaining about the Confederate flag paraphernalia.  When Williams referred to the black employees, he referred to them as "y'all," "y'all down there," and "y'all that work right there in that area."  (Doc. #32-16, Ware Dep. 77:21-79:21.)  Ware and Caldwell also complained to Jacobs about Williams and Bryant's comments, and Ware and Caldwell told Jacobs that they understood these comments to be based on race.

Jacobs, after speaking with Jeff Pitts about the penis comment, reported back to Ware that Pitts had said, based on the advice from another welding plant, he did not see anything wrong with what Bryant had said and that Ware and Caldwell took the words the wrong way. (Doc. #32-16, Ware Dep. 86:9-87:1.)

On July 30, 2008, Danny Jacobs called a meeting to discuss issues of racially offensive language.  Various employees signed a memo stating that they understood that harassment and offensive remarks would be subject to disciplinary action up to and including termination. (Doc. #48-24, Jacobs Memo.)

At some point after the penis incident, Ware met with Jeff Pitts, Jacobs and Copeland. At this meeting, Jeff Pitts told Ware that he was a troublemaker and instigator because he was complaining about the racial problems that existed at the plant.  According to Ware, Pitts told him that if he continued to cause trouble, Pitts would fire him and not let him draw unemployment.  (Doc. #32-16 Ware Dep. 87:17-88:1.)  Ware asked Pitts what would happen if he wore a Malcolm X shirt or NAACP shirt, or made strong remarks about white people. Pitts replied that he would fire Ware on the spot.  (Id. 91:11-21.)  After the meeting, Williams

and Bryant continued to wear Confederate flags and make racial comments, and Pitts, Jacobs, and Copeland quit talking with Ware and refused to look at him;  Pitts, Jacobs, and Copeland continued to talk and laugh with Williams and Bryant. (Id. 95:6-24.)

## 6.  Racial Graffiti

In September 2008, a break-in occurred at one of Pitts' plants.  After the break-in, management discovered in the early morning that "KKK" and "kill all blacks" had been painted in an area outside of the break room.  The police were called when the painting was located early the next morning, and the words were completely removed within a few hours. There is no evidence the paintings were done by anyone over whom Pitts had any control. (Doc. #32-11, Les Quay Aff. ¶ 4.)  Washington took pictures of the words "KKK" and "Kill all blacks," and he observed two supervisors, David Senn and Jacobs, giggling about the pictures.  (Doc. #32-14, Washington Dep. 97:15-17, 98:3-5.)

In addition to these paintings, Washington claims that he saw a painting of a hangman's noose located in the axle department of the Pitts plant.  (Doc. #32-14, Washington Dep. 100:10-18.)  After Plaintiffs' depositions, Pitts management located what it claims was a very abstract painting that was not readily perceived as a noose and removed it.  (Doc. #32-11, Quay Aff. ¶ 33.)

## 7.  The October 8, 2008 Meeting

Danny Jacobs called a meeting on October 8, 2008 to address the escalating racial tension at the Pitts facility.  Washington, Williams, Bryant, and  Jimmy Hudson, a white

supervisor, all attended the meeting.[2]  At that meeting, Williams stated that he was tired of the complaints about him wearing the Confederate flag, that this was the "fucking South," that black people are "niggers," that they will always be "niggers," and that you could look it up in the "god damn Webster's dictionary."  (Doc. #48-1, Pitts Dep. 48:3-49:10.)  At the meeting, Washington understood Williams to be saying that he, Washington, was a "nigger" and that all blacks were "niggers."  In the meeting, Williams said "nigger" three times in all.  (Doc. #32-14, Washington Dep. 54:11-15.)

After these comments, Jacobs and Hudson, the two white supervisors at the meeting, told Washington that he should respect Williams for being honest.  (Doc. #48-3, Hudson Dep. 89:12-17; Doc. #32-14, Washington Dep. 50:11-22; Doc. #48-2, Jacobs Dep. 105:1-8.) According to Copeland, two white men at the meeting came out of it laughing because Williams said "nigger" right in front of black employees.  (Doc. #48-5, Copeland Dep. 57:7-58:1.)  Jacobs did not take any notes about the October 8, 2008 meeting, and he did not write anybody up about it.

After the October 8 meeting, Jacobs called Jeff Pitts and told him that several black employees had complained about Confederate flags being at work, and Pitts understood from Jacobs and Hudson that the meeting ended with an agreement between the black employees and the white employees.  Both groups purportedly agreed that white employees could continue to

---

[2]  There is a factual dispute as to who were actually at the meeting.  According to Defendant Pitts, Washington was the only Plaintiff at the meeting, with Ware and Caldwell coming in right after the meeting concluded.  (Doc. #73 at 3.)  According to the Plaintiffs, Washington, Ware, and Caldwell were all at that meeting.  (Doc. #67 at 35, 65-66.)  Resolution of who attended the meeting is unnecessary, however, because it is undisputed that Washington attended the meeting and Ware, Caldwell, and Head each heard what was said at the meeting.

wear Confederate flag paraphernalia as long as black employees could continue to wear

whatever they considered to be the same type of representation, which apparently included

Malcolm X and Martin Luther King, Jr. apparel.  (Doc. #32-14, Washington Dep. 34:11-22.)

Pitts did not speak with any of the black employees at the meeting to see if they were satisfied

with the conclusion of the meeting.  After the meeting, Pitts understood that Williams and

Bryant continued to display Confederate flags on their clothing and welding helmets.  There

was no punishment given to Williams or Bryant after the meeting about the Confederate flags.

Ware has testified that Jacobs continually referred to black people as "y'all" and "y'all boys."

(Doc. #32-16, Ware Dep. 70:7-16.)  Head has heard or learned about Williams and Bryant

calling him and other black employees "them boys" or "boys". (Doc. #32-15, Head Dep.  87:16-

88:11, 91:23-93:5, 92:23-93:5.)

In addition, after the meeting, Hudson and Jacobs told Caldwell and Ware that

Washington had agreed to the resolution of the Confederate flag controversy, that is, to allow

the white employees to wear Confederate flags while the black employees could wear Malcolm

X and Martin Luther King, Jr. apparel.  Ware told the two supervisors he did not agree to that

resolution.  Ware and Caldwell later found out that Washington never did agree to the

resolution.  (Doc. #32-16, Ware Dep. 72:21-73:10.)

**8.  Guns and Threats**

When Washington and Caldwell discovered that Jacobs and Copeland had brought guns

to work in March, 2009, they wrote a memo to Jeff Pitts in which they stated that Jacobs and

Copeland were bringing firearms to the plant, and the bringing of firearms posed a threat to

them as well as others because of prior problems at the plant. (Doc. #48-25, Memorandum to

Jeff Pitts.) Washington testified that he felt threatened by the firearms because of his previous

conflicts with Jacobs and Copeland.  (Doc. #32-14, Washington Dep. 94:1-21.)  While the

memorandum does not list the prior problems to which Washington and Caldwell refer, viewed

in a light most favorable to the non-movants, the prior problems include the incidents listed

above.  In addition to these incidents, Washington, Head, and Caldwell had also complained to

Pitts' management that Mike Lawson was leaving work and not clocking out to retrieve

prescription drugs for Copeland.  After being reported, Copeland threatened to take

Washington outside and "whip his ass."  (Doc. #32-14, Washington Dep. 88:10-16.)

Presumably, the memorandum refers to this incident as a pre-existing problem between

Caldwell, Washington, and Copeland.

     Copeland and Jacobs were terminated as a result of the firearms incident.  After the

termination of Copeland's employment, Copeland returned to work and told Washington and

Caldwell that if he found out that they had anything to do with him getting fired, then he was

"going to get them one by one."  (Id. 93:1-22.)  Washington reported the threats to the police

who investigated the incident.  The "Separation of Employment" Form for both Jacobs and

Copeland indicates that they resigned for a reason not given.  (Doc. #48-27, Jacobs and

Copeland Separation Forms.)  The Forms indicate that they were not terminated.

## B.  Disparate Treatment and Retaliation

     In addition to the hostile environment claims, all four Plaintiffs bring various disparate

treatment and retaliation claims against Pitts.  The facts relating to those claims are included in

the discussion section of those claims.

# IV. DISCUSSION

## A. General Legal Standards

### 1. Hostile Work Environment

To establish a hostile environment claim based on racial harassment, a plaintiff must show that: (1) he belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) the employer was responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Hostile work environment claims involve both a subjective and objective component. "The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of the employment, and this subjective perception must be objectively reasonable." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (internal quotation marks and citation omitted). In analyzing the objective component of these claims, the Supreme Court has held that courts should consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the plaintiff's job performance. *See id.* at 1246; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). The conduct must be examined in context, not as isolated acts, and the severity and pervasiveness of the conduct must be judged under the totality of the circumstances. *Allen*, 121 F.3d at 647. " '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to

"amount to discriminatory changes in the 'terms and conditions of [a person's] employment.' "
*Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (citation omitted).

**2.  Disparate Treatment**

Where, as here, a plaintiff seeks to prove intentional discrimination on the basis of race
under 42 U.S.C. § 1981 by using circumstantial evidence of intent, the court applies the
framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v.
Green*, 411 U.S. 792 (1973).[3]  Under this framework, the plaintiff must establish a prima facie
case of discrimination. *Id.* at 802.  After the plaintiff has established a prima facie case of
discrimination, the burden of production is placed upon the employer to articulate a legitimate
nondiscriminatory reason for its employment action.  *Texas Dept. of Cmty. Affairs v. Burdine*,
450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the proffered reason was
not the true reason for the employment decision "either directly by persuading the court that a
discriminatory reason more likely motivated the employer or indirectly by showing that the
employer's proffered explanation is unworthy of credence."  *Id.* at 256; *Combs v. Plantation
Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  A plaintiff's prima facie case, combined with
sufficient evidence to find that the employer's asserted justification is false, may permit the trier
of fact to conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson Plumbing
Products, Inc.*, 530 U.S. 133, 147 (2000).

To establish a prima facie case for disparate treatment, a plaintiff must show that: (1) he
is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his

---

[3]  Both Title VII and § 1981 have the same requirements of proof and present the same
analytical framework.  *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

employer treated similarly situated employees outside his protected class more favorably than he was treated; and (4) he was qualified to do the job. *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1322 (11th Cir. 2006). The methods of presenting a prima facie case, however, "are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace*, *Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

### 3. Retaliation

To establish a prima facie case for retaliation, "a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Goldsmith v. Bagby Elevator Co.*, *Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

### B. Claims brought by Hennis Washington

Washington has the following claims remaining for resolution by this court: (1) hostile work environment; (2) disparate treatment in connection with his promotion to supervisor; (3) disparate treatment in connection with his position as assistant supervisor. (Doc. #67 at 73-79.)[4]

### 1. Hostile Work Environment

---

[4] After two briefing opportunities to respond to Pitts' Motion for Summary Judgment, Washington has failed to present any argument or evidence for the following claims: (1) disparate pay; (2) disparate treatment in connection with the promise of raises or higher pay; (3) disparate treatment in connection with overtime opportunities; (4) disparate treatment in connection with payment of bonuses except to the extent that it may relate to his promotion claim; (5) miscellaneous disparate treatment claims; and (6) retaliation. Consequently, Pitts' Motion for Summary Judgment as to these claims is due to be GRANTED. *See Johnson v. Bd. of Regents of the Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001) (holding that, once a party moves for final summary judgment, the opposing party must, at the very least, raise in his or her opposition papers any and all arguments or defenses they contend preclude judgment in the other party's favor); *Fed. R. Civ. P.* 56(e).

Pitts argues that Washington's hostile work environment claim must be dismissed because (1) Washington has failed to show the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; (2) Many of the instances of harassment had nothing to do with race; and (3) Pitts is not responsible for any hostile work environment. (Doc. #73 at 6, 15-17.)

Washington's hostile environment claim is, for the most part, based on the events fully described in the statement of facts. In summary, those events are: (1) Williams' comment to Parsons about not wanting to work with "niggers," and Jacobs' comment that Parsons lacks credibility because she has a baby by a black man; (2) the constant displays of Confederate flag paraphernalia by Williams, Bryant, and other white employees, despite many complaints by the Plaintiffs to various supervisors, and the resolution to the Confederate flag controversy, which allowed white employees to wear Confederate flags and allowed black employees to wear Martin Luther King, Jr. and Malcolm X apparel; (3) the danger created by white employees who were using marijuana at work, performing physical tasks, and harboring negative attitudes towards blacks; (4) the penis incident; (5) the October 8, 2008 meeting in which Williams used several racial slurs, and Jacobs and Hudson's response that the black employees should respect Williams for being honest; (6) observation of the "KKK" and "kill all blacks" paintings; (7) observation of a hangman's noose at the plant; (8) Copeland's "whip your ass" threat; (9) Copeland and Jacobs' bringing of guns and Copeland's "get you one by one" threat. To these events, Washington adds that a visiting plant manager who taught him how to put axles on trailers referred to his Mexican workers as "burritos." Washington felt uncomfortable about the

15

comment, as he wondered what the manager said about blacks when they were not around. (Doc. #32-14, Washington Dep. 55:23-56:3.)

Pitts first contends that Washington has failed to show that he was "subjected to" the penis incident, Williams' first use of the word "nigger" during his conversation with Parsons, and the paintings of "KKK" and "kill all blacks" because they were not directed at him and he only learned about them second-hand. (Doc. #36 at 29-30.) The court cannot agree. Second-hand comments may support a hostile environment claim so long as the employee was aware of the comments during the time the employee allegedly experienced the hostile environment. *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) ("A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her."); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1326 (N.D. Ga. 2001) ("Plaintiff may support a claim of hostile work environment by the use of harassing conduct she learned of through hearsay, so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment.").[5] This particular argument is without merit.

Pitts next argues that three of the above-described events are not related to Washington's race – the penis incident, the threats made by Copeland to Washington, and the visiting manger's comment that "burritos" work for him.

Pitts asserts that the penis incident, during which Bryant asked Ware and Caldwell to hold his penis, was not racially motivated but simply part of an ongoing dispute between Ware,

---

[5] The other Circuits are in agreement on this score. *See generally Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 336 (6th Cir. 2008) (finding that courts may consider harassing conduct even if the harassing acts were directed at others or occurred outside of the plaintiff's presence for the purposes of evaluating a hostile environment claim and that law from other circuits supports this view).

Caldwell, Bryant, and Williams.  This dispute, Pitts claims, arose because Bryant and Williams were angry with Ware and Caldwell because they constantly reported them to management for wearing Confederate paraphernalia and for smoking marijuana at work, not because they were black.  (Doc. #36 at 21-22.)  The court cannot agree.  There is sufficient evidence, viewed in a light most favorable to the non-movants, that the ongoing dispute between these four individuals had racial overtones.  Williams and Bryant wore Confederate flag paraphernalia on a daily basis despite the fact that such paraphernalia offended many black employees at the plant.  The penis incident was precipitated, at least in part, by the Confederate flag controversy:  Immediately after the incident, Williams stated that he was tired of the black employees complaining about the Confederate flag and other racial issues.  (Doc. #32-17, Caldwell Dep. 64:17-65:23.)  The penis incident, moreover, was one event that led to the October 8 meeting, during which racial issues were discussed and racial slurs were used.  In addition, the complaints of marijuana use also had racial overtones; Washington, Caldwell, and Ware were concerned that the marijuana use posed a danger to black employees because the use of drugs by individuals who harbored racial animus posed a particular threat to black employees.  The court finds, viewing the totality of the evidence in a light most favorable to the non-movants, that the penis incident is sufficiently enmeshed in the ongoing racial controversy at the plant so as to be considered in evaluating Washington's hostile environment claim.

As for the bringing of guns to work and Copeland's physical threats to Washington, Pitts argues those events were not racially motivated.  Pitts contends that Copeland threatened Washington because he reported to management that he was taking pills at work and that he was bringing firearms to work.  The court agrees that Washington has failed to show that Copeland

and Jacob's bringing of guns to work and Copeland's threats were racially motivated.  The only evidence Washington has produced to show that these events were racially motivated is that Copeland was non-responsive to complaints about racially hostile behavior.  (Doc. #67 at 82; Doc. #32-14, Washington Dep. 94:2-21.)  The vague assertion of non-responsiveness to racial complaints is not evidence that Copeland and Jacobs brought guns as part of a scheme to harass Washington and other black employees on the basis of race.  The presence of guns at the plant posed an obvious threat to the employees at the plant, but whites and blacks alike were threatened by the firearms.  Thus, Washington has failed to produce sufficient evidence that the guns at the Pitts facility and Copeland's threats were in any way related to race.  Thus, the court will not consider this evidence in evaluating Washington's hostile environment claim.

As for the visiting manger's comment, in which he stated that "burritos" work for him, Pitts argues that the comment is not related to Washington's race.  In response, Washington argues that the manager's racial slur regarding Mexicans is evidence of the hostile environment he suffered as a black man because the comment suggested that the manager would make racial slurs about blacks when blacks were not around.  To establish a hostile environment claim, Washington must show that the harassing comment was "based on a protected characteristic *of the employee*."  *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002) (emphasis added); *see also Childress v. City of Richmond*, 134 F.3d 1205, 1207 (4th Cir. 1998) (holding that white men could not bring a claim of hostile work environment discrimination based on comments made about black and female coworkers).  A comment referring to Mexicans as "burritos" does not relate to Washington's black race, and thus the court will not consider the comment in evaluating Washington's hostile environment claim.

18

Pitts next argues that it cannot be held vicariously liable for the paintings of "KKK" and "kill all blacks" because there is no evidence that Pitts was responsible for the paintings, which occurred during an overnight break-in.  In response, Washington argues that Pitts should have informed employees that such racially offensive and dangerous threats would not be tolerated, and that they should have provided training.  (Doc. #67 at 81-82.)  Because there is no evidence that the paintings were done by anyone over whom Pitts had any control, and Pitts took immediate action in reporting the graffiti to the police and cleaning up the graffiti, Pitts cannot be vicariously or directly liable for this event.  Thus, the court does not consider the paintings of "KKK" and "kill all blacks" in evaluating Washington's hostile environment claim.

To recap, the court does not consider the following evidence in evaluating Washington's hostile environment claim:  (1) Jacobs' and Copeland's bringing of guns to work and Copeland's threats; (2) the visiting manager's "burrito" comment; and (3) the paintings of "KKK" and "kill all blacks."  The court does consider the penis incident, along with the other evidence of alleged racial harassment.

Pitts next argues that even if Washington has produced evidence showing he was subjected to unwelcome harassment based on his race, Washington has failed to show that the harassment based on race was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment.  The court cannot agree. Viewing the evidence in the light most favorable to Washington, and applying the requisite objective factors to the totality of these events, the court finds that he has produced sufficient evidence that would allow a rational trier of fact to conclude that the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

First, Washington has produced sufficient evidence to establish that Pitts' conduct was frequent.  There is evidence that Williams wore his Confederate bandana every day and never removed the Confederate flag sticker from his welding helmet for the length of his employment. (Doc. #48-5, Copeland Dep. 54:23-55:2, 56:14-16.)  Washington, moreover, testified that he complained to Jacobs, Hudson, Stacey Nelson, and every other supervisor about Williams, Bryant, and other white employees wearing Confederate flag paraphernalia every day (Doc. #32-14, Washington Dep. 35:18-37:21), but no action was taken as a result of the complaints and the white employees continued to wear Confederate flag paraphernalia. (Id. at 38:17-23.)  Thus, Washington has submitted evidence that the presence of the Confederate flag was continuous and permeated the workplace.  *Compare Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 Fed. Appx. 829, 837 (11th Cir. 2006) (noting the continued displays of the Confederate flags as evidence that employer's misconduct was frequent), *with Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 58 (11th Cir. 2005) (noting that evidence of sporadic and isolated use of Confederate flags did not support hostile environment claim).  In fact, despite numerous complaints by black employees, Pitts never did prohibit the use of Confederate paraphernalia but rather "resolved" the issue by allowing black employees to wear Malcolm X and Martin Luther King, Jr. apparel, a resolution that a rational jury could find to be inadequate.

Second, a reasonable jury could determine Pitts' conduct to be severe.  The statements at the October 8 meeting were highly offensive and even more offensive considering the white

20

supervisors' admonition that Washington should respect Williams for his honesty.[6]  The court understands that a hostile environment claim is only actionable if the workplace is "permeated with discriminatory intimidation, ridicule and insult," and not where there is the "mere utterance of an . . . epithet."  *Harris*, 510 U.S. at 21 (citation omitted).  The comments at the October 8 meeting were no stray epithets.  The remarks came during a meeting called to address escalating racial tension at the plant, and the supervisors at that meeting not only did not discipline Williams for the remarks but complimented him for being honest.  In addition, a reasonable jury could determine that Pitts' management showed indifference to complaints of racial hostility.  Jacobs, after hearing about Williams' comment that he did not want to work with "no niggers," allegedly questioned the credibility of one of the white employees who heard the comment because the father of her child was black.  According to Gary Ware, Jeff Pitts allegedly told him that he was a troublemaker and instigator because he was complaining about racial problems and that he would be terminated if such complaining continued.

Third, a rational jury could determine that these incidents were humiliating and degrading to Washington.  The very nature of Williams' utterances at the October 8 meeting, coupled with the fact that they were made in Washington's direct presence and in front of his supervisors, help establish this factor.

---

[6]  These facts are taken in the light most favorable to Washington.  The court recognizes that the Defendant has a much different view of the response to Williams' use of racial slurs. (*See* Doc. #36 at 23) ("While Washington apparently took offense at this alleged comment, one can imagine how a supervisor, taken aback at the white employee's frankness, might say, something offhand like, 'You have to respect a guy for being honest.'") Someone might.  But the court must take the evidence in the light most favorable to Washington.

21

Finally, while Washington has not submitted any evidence showing the conduct unreasonably interfered with his job performance, this factor alone is not fatal to his hostile environment claim. *See Allen*, 121 F.3d at 647 (stating that conduct for a hostile environment claim must be judged under the "totality of the circumstances").

Pitts' final argument is that Washington has failed to show that Pitts is responsible for the hostile environment. An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). When no tangible employment action has been taken against the employee, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any. . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807. Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000). Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. *See id.*

In this case, which involves both co-worker harassment and supervisor harassment, Pitts does not dispute that it had knowledge of the events comprising the hostile environment claim. Rather, Pitts argues that it was actively engaged in correcting any problems, and cites the

following actions as evidence it exercised reasonable care to prevent and correct promptly any harassing behavior:  (1)  Pitts suspended Williams after he used the word "nigger" in his conversation with Parsons, and Pitts informed all employees that racially derogatory language would not be tolerated; (2)  Jacobs held a meeting to resolve tension after the penis incident; (3) Copeland and Jacobs were terminated for bringing guns to work, and when Copeland later returned to the plant to threaten Washington, Copeland was immediately escorted off the premises by Breeden, and a police report was filed; (4) the racially charged paintings were promptly removed.

The court concludes that there are genuine issues of material fact as to whether Pitts adequately investigated and responded to harassment complaints.  First, while Pitts suspended Williams for three days after his use of racially offensive language, Washington has submitted evidence that Williams continued to use such language after his suspension.  Indeed, Williams allegedly used the word "nigger" three times during the October 8 meeting, and no discipline was imposed.  Second, the meeting after the penis incident never resolved the Confederate flag controversy; instead, management determined that the problem should be resolved by allowing blacks to wear Malcolm X and Martin Luther King, Jr. apparel, a response the jury could determine to be inadequate, or even inflammatory of racial tensions.  Third, Ware has testified that Jeff Pitts specifically failed to correct the Confederate flag controversy.  In particular, Pitts allegedly told Ware that he was a troublemaker and instigator because he was complaining about the racial problems that existed at the plant.  Pitts allegedly further told Ware that if he continued to cause trouble, Pitts would fired him and not let him draw unemployment.  (Id. at 87:17-88:1.)  Ware asked Pitts what would happen if he wore a Malcolm X shirt or NAACP

23

shirt, or made strong remarks about white people.  Pitts replied that he would fire Ware on the

spot.  (Id. 91:11-21.)  After the meeting, Williams and Bryant continued to wear Confederate

flags and make racial comments.  For these reasons, the court concludes that there are genuine

issues of material fact as to whether Pitts adequately investigated and responded to harassment

complaints.

In light of the foregoing reasons, Pitts' Motion is due to be DENIED as to Washington's

hostile environment claim.

## 2.  Disparate treatment in promotion to supervisor

Washington claims Pitts discriminated against him by treating him less favorably than

other white supervisors.  This disparate treatment claim is, in substance, a combination of several

disparate treatment claims:  (a)  Pitts failed to pay Washington supervisor pay; (b)  Pitts failed to

provide Washington disciplinary authority; (c)  Pitts failed to provide Washington with a

supervisor's radio; (d) Pitts failed to invite Washington to supervisor meetings; (e) Pitts treated

Washington's crew less favorably than any other crew.  (Doc. #67, 76-80.)  The court addresses

each disparate treatment claim in turn.

## a.  Pay

In order to establish a prima facie case of disparate treatment, Washington must show

that he was a "qualified member of a protected class and was subjected to an adverse

employment action in contrast with similarly situated employees outside the protected class."

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

The court finds that Washington has failed to establish a prima facie case of disparate

treatment in connection with his payment as supervisor because he has failed to show that he was

paid less than a similarly situated white supervisor.  Washington has identified the following white supervisors who were paid more than he was paid as a supervisor:  (1)  Jimmy Hudson, (2) Stacey Nelson, (3)  Danny Senn, and (4) Randall Hudson.  (Doc. #32-14, Washington Dep. 109:20-110:25.)  Washington made $14.50 per hour as a supervisor.  (Doc. #67 at 77.)  Pitts has submitted uncontested evidence that Jimmy Hudson made $12.50 per hour, and is thus not a valid comparator because he actually makes less money than Washington made.  (Doc. #32-2, Hammett Aff. ¶ 13.)  As for Stacey Nelson and Danny Senn, Pitts has submitted evidence that these individuals supervise different departments than those supervised by Washington; Nelson and Senn supervise the van department, where more complicated trailers are assembled, and the supervision of that process requires more skill than Washington's supervision of the flatbed line. (Doc. #32-1, Pitts Aff. ¶ 27.)  Because Senn and Nelson supervise different departments that assemble different products, the court finds that these two individuals are not valid comparators because they are not "similarly situated" with Washington.  *See Wilson*, 376 F.3d at 1091 (comparators must be "nearly identical.")  As for Randall Hudson, Pitts has submitted evidence that Hudson served as assistant plant manager for numerous months when one of Pitts' plants first reopened, and as a result of this supervisory experience, he receives $16.00 per hour.  (Doc. #32-1, Pitts Aff. ¶ 27.)  Because Hudson possessed far more supervisory experience than Washington, he is not similarly situated with Washington and is not a valid comparator.  In sum, because the four white supervisors that Washington identifies are not valid comparators, Washington has failed to state a prima facie case of discrimination in regards to his payment as supervisor.

For the foregoing reasons, Pitts' Motion is due to be GRANTED as to Washington's disparate treatment claim regarding his payment as supervisor.

**b. Discipline**

Washington claims that Pitts subjected him to disparate treatment because, although he is a supervisor, he does not have the authority to impose discipline as the other white supervisors do. The court finds that this claim fails to state a prima facie case of disparate treatment. Washington has submitted no evidence that Pitts prevented him from imposing discipline. Instead, Washington has testified that he has never imposed discipline in the past. (Doc. #32-14, Washington Dep. 22:11-13.) Thus, Washington has failed to state a prima facie case because he has failed to show that he was subjected to adverse employment action and that he was treated differently than similarly situated white employees. Pitts' Motion is due to be GRANTED as to this claim.

**c. Radios**

Washington claims that Pitts subjected him to disparate treatment by not providing him a radio which supervisors are provided for communication throughout the plant. The court cannot conclude that the denial of a radio is an adverse employment action. Washington has submitted no evidence showing why the denial of a radio is a "serious and material change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239.[7] Accordingly, to the extent

---

[7] The court notes that the standard enunciated in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (U.S. 2006), which defines an adverse employment action as an action that would dissuade a reasonable worker from making or supporting a discrimination charge, applies to retaliation claims, but has no application to substantive discrimination claims. *See Crawford v. Carroll*, 529 F.3d 961, 974 n.14 (11th Cir. 2008).

Washington states a  claim based on the provision of a radio, Pitts' Motion for Summary Judgment is due to be GRANTED.

### d.  Meetings

Washington claims that he was discriminated against when Pitts refused to invite him to a supervisors' meeting.  Washington testified that he was never invited to a supervisors' meeting, and Jimmy Hudson never remembers Washington attending any of the meetings supervisors regularly attend. (Doc. #48-3, Washington Dep. 21:8-22:13; Doc. #48-3, Hudson Dep. 55:2-5.) In response, Pitts has submitted evidence that Bill Breeden, who was the plant manager during the entire time that Washington was a supervisor, had stopped including welding supervisors in the production meetings in January 2009.  (Doc. #32-10, Breeden Aff. ¶ 11.)

The court finds that Washington has failed to establish a prima facie case of disparate treatment because he has failed to show that not being invited to the production meetings constitute adverse employment actions.  Washington has submitted no evidence showing why not being included in attendance at these production meetings was a "serious and material change in the terms, conditions, or privileges of employment."  *Davis*, 425 F.3d at 1239.  In addition,  Washington cannot show that he was treated differently from a similarly situated white supervisor.   Washington supervised a line for less than ninety days before Pitts consolidated his line for financial reasons.  (Doc. #48-1, Pitts Dep. 90:12-90:7.)  Washington was thus a newly-appointed supervisor, and he has failed to identify a newly-appointed white supervisor who was invited to meetings, because there were no newly-appointed line supervisors at the time Washington was a supervisor.

For these reasons, Pitts' Motion is due to be GRANTED as to this claim.

**e.  Treatment of Washington's crew**

Washington claims that the crew he supervised was treated less favorably than any other crew.  In particular, Washington claims that his crew had to produce more trailers in less amount of time and was paid less bonus money for producing a certain amount of trailers.  (Doc. #67 at 78-79.)  In addition, Washington claims that his crew was denied overtime opportunities and denied opportunities to build different types of trailers, which would have made the crew more productive and more likely to receive bonus money.  (Id.)

The court finds that Washington has failed to state a prima facie case of discrimination with respect to how his crew was treated.  In stating this disparate treatment claim, Washington compares himself to Randall Hudson and Danny Jacobs.  (Doc. #67 at 79.)  As for Jacobs' crew, the court finds that he is not a valid comparator.  Washington has submitted no evidence establishing the bonus system, production requirements, or overtime opportunities of the crew that Jacobs supervised.  The court has no evidence of  the treatment of Jacobs' crew to compare to the treatment of Washington's crew.  As for Hudson's crew, the court finds that this group is also not a valid comparator.  Hudson supervises a consolidated flatbed line, which includes several flatbed lines, while Washington supervised a single flatbed line.  A consolidated line and a non-consolidated line are not "similarly situated" for purposes of stating a prima facie case. Washington has submitted no evidence as to what the bonus system, production requirements, or overtime opportunities were for any non-consolidated line.  Because Washington has submitted no evidence as to what  these other lines were receiving as bonuses before the consolidation, Washington has failed to identify a valid comparator and  to establish that his line received less favorable treatment than any other line.  As such, Washington has not presented substantial

evidence that his line received less favorable treatment than any other, and so he has failed to state a prima facie case. Pitts' Motion as to this claim is due to be GRANTED.

### 3. Disparate Treatment as Assistant Supervisor

Washington claims that Pitts discriminated against him by treating him less favorably than other white assistant supervisors. In particular, Washington claims that he lacks the responsibilities of an assistant supervisor, lacks the pay of an assistant supervisor, lacks the radio of an assistant supervisor, and is not permitted to issue discipline. This claim is not supported by the deposition designations. (Doc. #67 at 79 n.107.) The cited deposition testimony relates to Washington's experience as a supervisor, not as an assistant supervisor. (Doc. #32-14, Washington Dep. 21:8-22:13.) For this reason, Pitts' Motion as to this claim is due to be GRANTED.

### B. Claims of Plaintiff Gary Ware

Ware has the following claims remaining for resolution by this court: (1) hostile work environment; (2) disparate treatment in pay; (3) disparate treatment in failure to promote; (4) disparate treatment in the terms and conditions of employment, which only includes (a) the failure to pay him bonuses on multiple lines at the same time, (b) the requirement to do rework, (c) the existence of standing water; and (5) retaliation. (Doc. #67 at 64-73.)[8]

### 1. Hostile Work Environment

_____

[8] After two briefing opportunities to respond to Pitts' Motion for Summary Judgment, Ware has failed to present any argument or evidence for the following claims: (1) discrimination in overtime; (2) disparate treatment, except to the extent that he contends that being required to do rework constituted disparate treatment. Consequently, Pitts' Motion for Summary Judgment as to these claims is due to be GRANTED. *See Johnson v. Bd. of Regents of the Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001); *Fed. R. Civ. P.* 56(e).

Ware's hostile environment claim is based on the events described in the facts section, and summarized in the discussion of Washington's hostile environment claim.

Pitts makes the same arguments for dismissing Ware's hostile environment claim as it did for dismissing Washington's hostile environment claim.  That is, the claim should be dismissed because (1)  Ware has failed to show the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; (2) Many of the instances of harassment had nothing to do with race; and (3) Pitts is not responsible for any hostile work environment. (Doc. #35 at 24-26.)  The court has already concluded that these arguments are without merit in the context of Washington's hostile environment claim.  Because Ware's hostile environment claim is based on the same evidence as Washington's hostile environment claim, the court concludes that Pitts' Motion as to Ware's hostile environment claim is due to be DENIED.

**2.  Disparate Treatment in Pay**

**a.  Discrimination in paying $13.00**

Ware claims that Pitts racially discriminated against him by paying him at the rate of $13.00 per hour when similarly situated white employees started at higher salaries.

To make out a prima facie case regarding discrimination in pay under section 1981, Ware must establish that: (1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside his protected class received higher compensation; and (4) he was qualified to receive the higher wage.  *See Cooper v. Southern Co.*, 390 F.3d 695, 734-735 (11th Cir. 2004) (overruled on other grounds).  The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects."  *Wilson v. B/E Aerospace, Inc.*,

376 F.3d 1079, 1091 (11th Cir. 2004) (quotation marks and citation omitted). To be similarly situated in all relevant respects means "[t]he comparator must be nearly identical to the plaintiff." *Id.*

The court finds that Ware has failed to establish a prima facie case of disparate pay because the two potential comparators whom he has identified – Daniel Harlow and Ronnie Caver (Doc. #67 at 69) – are not similarly situated to Ware. Pitts has submitted undisputed evidence that Harlow and Caver had worked at Pitts' Dorsey plant under previous owners, and this previous experience was highly prized when the two individuals were hired during the reopening phase of the plant, because they would not require the same level of training that those without experience at the Dorsey plant would require. (Doc. #32-12, Hudson Aff. ¶ 30.) This experience benefitted Pitts, considering the time pressure it was under to become productive and operational. In fact, Gabriel Head, Ware's co-Plaintiff, had prior Dorsey experience and was initially paid at $13.50 per hour for this reason. Because Harlow and Caver are not similarly situated to Ware, Ware has failed to establish a prima facie case of disparate pay, and Pitts' Motion for Summary Judgment as to Ware's disparate treatment in pay claim regarding the pay rate of $13.00 is due to be GRANTED.

**b. Discrimination in promising to pay $13.50**

Ware appears to contend that Pitts' alleged misrepresentation concerning his starting pay rate is a separate and distinct basis for a finding of discriminatory treatment. Ware claims that Pitts discriminated against him by promising to pay him $13.50 per hour but actually paying him $13.00 per hour.

As a threshold matter, the court has just determined that Ware's starting pay rate of $13.00 per hour was not discriminatory because Ware failed to identify any valid comparators. In light of this ruling, the court is unclear as to how failure to pay a certain promised wage could be discriminatory when the actual payment of a lower wage was not discriminatory. Nonetheless, to state a prima facie case for disparate pay based on the theory that the misrepresentation was discriminatory, Ware must establish that similarly situated white welders were not subject to the same misrepresentations.  Pitts has submitted uncontested evidence that whites and blacks alike have misunderstood their rates of pay because they have not understood the attendance and production bonus system.  (Doc. #32-2, Hammett Aff.  ¶ 26; Doc. #32-12, Hudson Aff.¶ 26.)  In light of this evidence, Ware has failed to state a prima facie case of disparate pay regarding the alleged misrepresentations of starting pay rates, and Pitts' Motion for Summary Judgment as to this claim is due to be GRANTED.

### 3.  Disparate treatment in failure to promote

Ware contends that Pitts discriminated against him by failing to promote him to a supervisor position. Ware claims  that Billy Copeland was promoted to a supervisor position[9] in mid-September 2008 even though Ware had more seniority and experience.

To establish a prima facie case of discrimination with respect to promotions, Ware must establish that:  (1) he is a member of a protected class; (2) he is qualified for and applied for the

---

[9]  In Pitts' initial brief in support of the present motion, Pitts argued that Ware failed to make out a prima facie case of discrimination in promotions in connection with the "lead man" position because Ware had lead man duties and was paid a lead man wage.  Ware did not respond to this argument but rather centered his promotion claim on the supervisor position that Copeland received.  Consequently, Pitts' Motion is due to be GRANTED to the extent Ware states a disparate treatment claim regarding the lead man position.  *See Johnson v. Bd. of Regents of the Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001); *Fed. R. Civ. P.* 56(e).

position; (3) he was rejected despite his qualifications; and (4) the position was filled with an individual outside the protected class. *Springer v. Convergys Customer Mgmt. Group. Inc.*, 509 F.3d 1344, 1348 n.2 (11th Cir. 2007).

The parties do not dispute that Ware has made out a prima facie case for discrimination in not being promoted to the supervisor position. Pitts contends, however, that it has at least four legitimate non-discriminatory reasons for not selecting Ware for the supervisor position: (1) Copeland had more recent experience at two similar trailer companies; (2) Copeland was well known by Pitts' management; (3) Copeland was more conscientious in performing his work; (4) Copeland had superior leadership potential. (Doc. #35 at 13-14; Doc. #73 at 28.) With this evidence, Pitts has met its burden of producing a legitimate, race-neutral reason for the promotion decision.

To satisfy his burden of establishing that each of these legitimate, race-neutral reasons are but pretext for discrimination, Ware provides the following evidence: (1) There was no posting for the supervisor position awarded to Copeland, and this subjective promotion procedure is vulnerable to discrimination; (2) Copeland and Jacobs ignored complaints about race discrimination; (3) Jacobs hired Williams despite protests that Williams harbored racial animus; (4) Jacobs' comment that Parsons lacked credibility because the father of her child is black; (5) after the October 8 meeting, in which Williams used racial slurs, Jacobs' comment that Washington should respect Williams for being honest; (6) Jacobs told Ware that Washington had agreed to the resolution of the Confederate flag controversy, that is, to allow the white employees to wear Confederate flags while the black employees could wear Malcolm X and Martin Luther King, Jr. apparel, even though Washington never did agree to the

resolution; and (7)  Jeff Pitts told Ware that he was a troublemaker and instigator because he was complaining about the racial problems that existed at the plant.

The court finds that Ware has created an issue of fact as to whether Pitts' reasons for promoting Copeland over Ware are pretextual.  As a threshold matter, while the court ultimately finds that Ware has created an issue of fact regarding pretext, the court does agree with Pitts in two respects.  Pitts is correct that subjective promotion procedures alone do not show pretext. *See Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001) ("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes.").  Pitts is also correct that, when a court is assessing comparative qualifications between candidates in order to determine whether the employer's reason for the promotion is pretextual, the plaintiff must show that the disparities in qualifications are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) (quoting *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000)).  These two propositions, however, do not entitle Pitts to summary judgment on this claim because Ware does not solely rely on Pitts' subjective promotion procedures, or solely rely on a comparative qualification argument to establish pretext.

The record indicates that Jeff Pitts made the ultimate decision to promote Copeland to supervisor based on representations made to him by Danny Jacobs and Randall Hudson about Copeland's welding skills and leadership abilities.  (Doc. #32-1, Pitts Aff. ¶ 42.)  While the

evidence listed above in connection with the hostile environment claims does not relate directly to the employment decision, Ware has submitted sufficient circumstantial evidence of discriminatory intent to create an issue of fact as to whether Pitts' reliance on these representations as the basis of Copeland's promotion is pretextual.  *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) (holding that potentially discriminatory comments that were not directly related to the employment decision could contribute to a circumstantial showing of discriminatory intent.)

Accordingly, Pitts' Motion for Summary Judgement as to Ware's failure to promote claim is due to be DENIED.

## 4. Disparate treatment in terms and conditions of employment

### a. Bonuses

Ware claims that Pitts discriminated against him by denying him bonus money.  Ware argues that he performed a substantial amount of work on different welding lines, but he was only paid a bonus for one of the lines to which he was assigned, the flatbed line, when he should have been paid a bonus for each line on which he worked.

The court finds that Ware has failed to state a prima facie case of disparate treatment in the payment of bonuses.  Ware has not identified a similarly situated white welder who was paid a bonus for each line on which he or she worked.  To the contrary, Pitts has produced uncontested evidence showing that no employee received bonuses for more than one line even when an employee performed work on more than one line.  (Doc. #32-12, Hudson Aff. ¶ 16; Doc. #32-2, Hammett Aff. ¶ 15.)  Accordingly, Pitts' Motion for Summary Judgment as to this claim is due to be GRANTED.

Ware also appears to argue that he was discriminated against in connection with bonuses because the long flatbed line, to which he was assigned, had a higher production requirement with lower bonuses. This claim fails. Ware has failed to provide a citation to the record for the proposition that the long flatbed line had a higher production requirement and a lower bonus opportunity, and that the line was composed of a majority of black employees. (Doc. #67 at 71 n.73.) Consequently, Ware has failed to identify a similarly situated white employee on another line who produced less but was paid more bonus money. Accordingly, to the extent Ware bases his bonus claim on the proposition that the long flatbed line was composed of mostly black employees who performed more work and received fewer bonuses, Pitts' Motion for Summary Judgment as to this claim is due to be GRANTED.

Ware also claims that Pitts discriminated against him when a permanent position became open in the axle department, where there were more opportunities for bonuses, and the position was given to Jimmy Crawley, a white welder. The court finds that Ware has failed to establish a prima facie case of discrimination for this claim, because there is no evidence comparing the bonus system in the axle department with the bonus system in the flatline. Accordingly, Pitts' Motion for Summary Judgment as to Ware's disparate treatment claim based on the payment of bonus money is due to be GRANTED.

**b. Rework**

Ware alleges that he was subject to disparate treatment in job assignments when Pitts required him to re-do the poor quality work of white employees who refused to do their own work. Ware contends that Johnny LNU, Daniel Harlow, and Justin Gaven, all white welders, refused to re-do their poor quality work, and Ware was required to re-do their work for them.

36

In response, Defendants argue that Ware's claim based on the performance of rework must be dismissed because performing rework does not constitute an "adverse employment action."  In addition, Pitts argues that being required to do rework was one of the things required of workers who were offered overtime, and thus it could be something which resulted in increased pay and prestige.

In order to establish a disparate treatment race claim, a plaintiff must establish that his employer took adverse employment action against him.  Although an adverse employment action need not be an ultimate employment decision, such as termination, failure to hire or demotion, it must meet a "threshold level of substantiality." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001) (quotation marks omitted).   While evidence of "direct economic consequences" is not always required, to prove adverse employment action, "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Id.* at 1239.  The employee's subjective perception of the seriousness of the change is not controlling; rather this issue is viewed objectively from the perspective of a reasonable person in the circumstances. *Id.*

In *Davis*, the Eleventh Circuit recognized that a change in work assignments could amount to a "substantial and material change" in the terms, conditions, or privileges of employment in "unusual instances." *Id.* at 1245.  For example, in *McNely v. Ocala Star-Banner Corporation*, 99 F.3d 1068 (11th Cir. 1996), a supervisor at a newspaper endured adverse employment action when he was reassigned the duties of a janitor, including cleaning bathrooms, and then transferred to the shipping department, where he was required to perform physically strenuous tasks. *See McNely*, 99 F.3d at 1078.  In most cases, however, the loss of prestige on

account of a change in work assignments, without any tangible harm, will not constitute adverse employment action, especially where the work assignment at issue is temporary and does not affect the employee's permanent job title or classification.  *Davis*, 245 F.3d at 1245.

The court concludes that Ware has failed to show that the assignment of rework constitutes an adverse employment action.  According to Ware's own testimony, he does not contend that whites in general refused to do rework or that black workers had to do all of the rework; rather, Ware points to an isolated number of incidents where three white employees refused to perform rework while black employees were asked to do the work.  (Doc. #32-16, Ware Dep. 98:20-101:23.)  Although Ware's workload appears to have increased when he received the assignment of rework, this temporary assignment, without a change in compensation or position, does not amount to a "serious and material change in the terms, conditions, or privileges of employment."  *See Davis*, 245 F.3d at 1239 (emphasis omitted).  In fact, Ware testified that he is a better welder than any of the white welders, and that Danny Jacobs told him that he was asked to do the rework because he was a better welder than the white employees who originally performed the work.  (Doc. #32-16, Ware Dep. 99:25-100:5, 101:2-9.) Considering the isolated and temporary nature of the rework incidents and Ware's own testimony that his superior skills resulted in the rework demands, the court concludes that Ware has failed to establish that he suffered an adverse employment action when he was assigned rework that white employees would not complete.  Accordingly, Pitts' Motion for Summary Judgment as to Ware's disparate treatment claim regarding rework is due to be GRANTED.

**c.  Segregation and Standing Water**

Ware alleges that Pitts subjected him to disparate treatment by assigning him to work in areas that often contained standing water.  In essence, Ware claims that the plant floor was racially segregated so that black employees were forced to work in areas where the standing water was worse than in other areas.

In response, Pitts argues that Ware has failed to state a prima facie case because there is uncontested evidence that standing water existed all over the facility, that white workers and black workers both worked in areas with standing water, and that standing water was the random result of rain and leaks rather than a calculated attempt to make work more difficult for black employees.

The court finds that working in standing water at the Pitts plant does not constitute an adverse employment action, and thus Ware has failed to state a prima facie case.  Viewing the facts in the light most favorable to Ware, the record shows that both blacks and whites had to work in standing water.  (Doc. #32-16, Ware Dep. 105:4-106:4; Doc. #32-14, Washington 103:14-22.)  Thus, the purported adverse employment action for this claim is not the presence of standing water in general, but the increased amount of standing water in the areas where the black employees worked as compared to the white employees.  The court cannot conclude that the relative increase in the amount of standing water constitutes a "serious and material change in the terms, conditions, or privileges of employment."  *Davis*, 245 F.3d at 1239.  Accordingly, Pitts' Motion for Summary Judgment as to this claim is due to be GRANTED.

**5.  Retaliation**

Ware alleges that Pitts retaliated against him for filing an EEOC charge.  Ware filed an EEOC charge on November 7, 2008 alleging, among other things, that he and co-Plaintiff Hennis

Washington were completing supervisor work but not receiving supervisor wages.  (Doc. #48-17, Ware EEOC Charge.)  After the filing of that charge, Pitts promoted Hennis Washington to supervisor but did not promote Ware.  Ware alleges that the selection of Washington over Ware in the face of Ware's specific EEOC charge constitutes retaliation against Ware for engaging in the protected activity of filing an EEOC charge.  Ware further contends that Washington's promotion was in fact a "sham," as Washington did not receive an increase in pay or responsibility.  (Doc. #32-16, Ware Dep. 122:22-124:11 (describing retaliation theory)).

In response, Pitts argues that Ware has failed to state a prima facie case of discrimination because he has failed to show that he suffered an adverse employment action as a result of Washington's promotion.  In particular, Pitts argues that, at the time Washington was promoted, Ware already received the same pay and performed the same duties that Washington received as a result of his promotion.  Thus, Pitts contends that Washington's promotion cannot be an "adverse employment action."

For a retaliation claim to be actionable, the adverse actions against the employee must be "materially adverse."  Mere slights or annoyances are insufficient to support a retaliation claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (U.S. 2006).  To constitute a materially adverse action in the context of a retaliation claim, the employer's action must be materially adverse from the standpoint of a reasonable employee, such that it would dissuade a reasonable worker from making or supporting a discrimination charge.  *Id.*  Although a court will look to the "totality of the alleged reprisals," the court will "consider only those that are truly adverse." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) (quotations omitted). Courts focus on the materiality of the challenged action and the

perspective of a reasonable person in the plaintiff's position. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68-69.

The court finds that Ware has failed to state a prima facie case of retaliation because he has failed to show he suffered an adverse employment action.  The record shows that Ware was already receiving the same pay and performing the same duties that Washington received as a result of the promotion.  The supervisory position that Washington received in November 2008 after Ware filed his EEOC complaint was a promotion to "lead man" with a pay increase to $13.50 an hour. (Doc. #32-3 at 1.)  As for pay, by June of 2008, Ware was already making $13.50 per hour.  (Doc. #32-3 at 1; Doc. #32-16, Ware Dep. 48:11-19.)  As for duties, Ware was already performing "lead man" duties before Washington's promotion, as he was in a lead man position with responsibility over "body borders" or "body boards," and he received a raise to reflect that additional responsibility.  (Doc. #32-13, Jacobs Dep. 83:14-22; Doc. #32-1, Pitts Aff. ¶ 29).  Accordingly,  Ware has failed to allege that Pitts took an adverse employment action against him, because a reasonable employee would not be dissuaded from making a discrimination complaint when an employer promotes another employee to a position that the complaining employee already occupies.  *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Accordingly, Pitts' Motion for Summary Judgment as to Ware's retaliation claim is due to be GRANTED.

**C.  Claims of Plaintiff Timothy Caldwell**

Caldwell has the following claims remaining for resolution:  (1) hostile work environment; (2) discrimination relating to his demotion from aluminum welder; and (3) retaliation.[10]

## 1.  Hostile Work Environment

Caldwell's  hostile environment claim is based on the events described in the facts section, and summarized in the discussion of Washington's hostile environment claim.

Pitts makes the same arguments for dismissing Caldwell's  hostile environment claim as it did for dismissing the hostile environment claims previously discussed.  The court has already concluded that these arguments are without merit in the context of Washington and Ware's hostile environment claim.  Because Caldwell relies on the same evidence, the court concludes that Pitts' Motion as to Caldwell's hostile environment claim is due to be DENIED.

## 2.  Disparate treatment in reduction in pay and demotion

Caldwell claims that he was laid off and eventually rehired at a job with lower pay, all in violation of section 1981.

## a.  Layoff

Caldwell claims that Pitts discriminated against him when it laid him off as an aluminum welder on August 7, 2009.  Pitts does not contest that Caldwell has stated a prima facie case for disparate treatment in connection with his layoff.

---

[10]  After two briefing opportunities to respond to Pitts' Motion for Summary Judgment, Caldwell has failed to present any argument or evidence for the following claims:  (1)  disparate pay;  (2) discrimination in connection with the promise of a higher pay rate;  (3)  discrimatory treatment in overtime;  (4)  miscellaneous claims relating to discriminatory treatment. Consequently, Pitts' Motion for Summary Judgment as to these claims is due to be GRANTED. *See Johnson v. Bd. of Regents of the Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001); *Fed. R. Civ. P.* 56(e).

To satisfy its burden of producing a legitimate, race-neutral reason for laying off Caldwell, Pitts has produced the following evidence:  Caldwell was laid off in order to lower costs because of lower product demand.  (Doc. #32-1, Pitts Aff. ¶ 41.)  Les Quay, the plant manager who laid Caldwell off, testified that Caldwell was laid off because there were no orders requiring aluminum welding, and Caldwell was the only aluminum welder.  Pitts points out that various employees, both black and white, were laid off in the summer of 2009 in order to reduce costs.[11] With this evidence, Pitts has met its burden of producing a legitimate, race-neutral reason for Caldwell's lay off.

To satisfy his burden of showing that this legitimate, race-neutral reason is but a pretext for discrimination, Caldwell has submitted the following evidence:  (1)  Two white welders were hired to do aluminum welding while Head was laid off, which indicates that reduced product demand was not the reason for Caldwell's lay off;  (2)  Even if there was no aluminum welding work to be done at the time of Caldwell's layoff, there was steel welding that needed to be done, and Les Quay, the plant manager who laid Caldwell off, checked no records to see that Caldwell had experience as a steel welder and did not permit Caldwell to perform steel welding in lieu of being laid off.

The court finds that this evidence is insufficient to create a genuine issue of fact as to whether Pitts' reason for laying off Caldwell is pretextual.  First, the timing of events makes Caldwell's discrimination claim implausible.  Head was transferred to the aluminum welder position and received a corresponding pay raise to $14.00 around July of 2009.  (Doc. #32-3, Pay

---

[11]  These employees, along with their races and lay off dates, are as follows:  (1)  Michael Bryan (White), 7/24/09; (2)  Gabriel Head (Black), 7/31/09; (3)  Timothy Caldwell (Black), 8/7/2009; and (4)  John Cooper (White), 8/7/09.  (Doc. #32-2, Hammett Aff. ¶ 18.)

Chart (indicating Caldwell's raise to $14.00 on July 30, 2009)); (Doc. #32-17, Caldwell Dep. 31-32 (indicating Caldwell ran the aluminum floor welding machine a week or two before his pay was increased to $14.00)); (Doc. #33 at 26.)  Shortly after the promotion, around August 7, 2009, Head was laid off because there was no outstanding order requiring aluminum welding.  The two white aluminum welders were hired on August 31, 2009.  Pitts called Caldwell back to work as a steel welder on September 3, 2009, and called back Gabriel Head, also a black employee, on August 31, 2009.  Thus, Pitts called two black employees, Caldwell and Head, back to work at approximately the same time that the white aluminum welders were hired.  Moreover, of the four welders who were laid off in the summer of 2009, the two black employees, Head and Caldwell, were asked to return to work while the two white employees were not asked to return to work. (Doc. #32-2, Hammett Aff. ¶ 18.)  Considering that Caldwell was asked to return to work less than a month after he was laid off, that Caldwell was asked to return to work at approximately the same time that the white aluminum welders were hired, and that Caldwell was chosen to return to work over two other white employees who were laid off at the same time as Caldwell, the court cannot conclude that Caldwell has created an issue of fact as to whether Pitts' reason for laying off Caldwell is pretextual.  Second, that Pitts could have chosen to lay off a steel welder and transfer Caldwell to that position instead of laying him off does not establish pretext. Caldwell has submitted no evidence establishing that a steel welding position was available during the period of his lay off, and he has not identified any individuals who were transferred during the period of his lay off.  *See Libront v. Columbus McKinnon Corp.*, 832 F. Supp. 597, 627 (W.D.N.Y. 1993) (finding no inference of discrimination can be drawn from the defendant's failure to offer plaintiffs the opportunity for a transfer because there is no evidence that there

44

were any transfers during the relevant period); *Haywood v. Electrolux Home Prods, Inc.*, No. Civ.A. 8:03-0259-26AK, 2004 WL 3249251, at *7 (D.S.C. August, 25, 2004) (same). Accordingly, Pitts' Motion as to Caldwell's disparate treatment claim regarding his layoff is due to be GRANTED.

**b.  Rehiring**

Caldwell claims that Pitts discriminated against him when it failed to rehire him as an aluminum welder on September 3, 2009, at a rate of $14.00 per hour, and instead hired him as a steel welder, at a rate of $11.50 per hour.

The court finds that Caldwell has stated a prima facie case of discrimination for his claim that Pitts discriminated against him by failing to rehire him as an aluminum welder:  Caldwell, a black employee, was qualified to be an aluminum welder, was laid off as an aluminum welder, was later rehired to a steel welder position at a lower rate of pay (a demotion), and was replaced as an aluminum welder by a white employee.[12]

To satisfy its burden of producing a legitimate, race-neutral reason for not hiring Caldwell as an aluminum welder (and instead hiring him as a steel welder), Pitts has produced the following evidence:  (1)  During the time that Caldwell was laid off, Pitts discovered that one of the trailers that Caldwell welded during his time as aluminum welder had numerous flaws,

---

[12]  The Defendants argue that Caldwell has failed to state a prima facie case because he was not qualified to be an aluminum welder in light of his poor job performance.  Because the issue of Caldwell's poor job performance is intertwined with the issue of whether Pitts' nondiscriminatory reasons for the demotion are pretextual, Caldwell's job performance is examined at the pretext stage of the *McDonnell Douglas* analysis.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997); *Vessels v. Atlanta Ind. School System*, 408 F.3d 763, 769 (11th Cir. 2005) (noting "that the prima facie case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession.")

and in light of his deficient performance as an aluminum welder, Pitts could not continue to employ him in that position. Pitts claims that Caldwell's welding errors cost it approximately $5,350. (Doc. #32-11,Quay Aff.¶ 12.) Pitts also claims that it expended approximately twenty-seven employee hours in attempting to mitigate the problem, at a cost of approximately $1,350, incurred further material costs, and then, as a result of the bad welding, had to sell the trailer at a discount of $4,000. (Id. ¶ 8-12.) With this evidence, Pitts has met its burden of producing a legitimate, race-neutral reason for not rehiring Caldwell as an aluminum welder.

To satisfy his burden of showing Pitts' proffered reasons are but pretext for discrimination, Caldwell has submitted the following evidence: (1) Danny Harlow, a steel welder, was not laid off at the time that Caldwell was laid off even though Harlow had a terrible attendance record; (2) Poor work performance cannot be the reason for the layoff because it was not the reason given at the time of the layoff; (3) Caldwell complained, just prior to the layoff, that the aluminum floor welder was faulty and causing him to create welds that were sub-standard, but he was told to finish the job anyway (Doc. #32-17, Caldwell Dep. 37:24-38:18); (4) There is no provision in the employee handbook for a reduction in pay if an employee is having performance issues. (Doc. #48-15, Pitts Handbook; Doc. #48-2, Jacobs Dep. 28:22-29:2; Doc. #48-1, Pitts Dep. 71:18-72:1); (5) Pitts cannot name anyone other than Gabriel Head and Tim Caldwell who were given a pay reduction as discipline because of performance problems (Doc. #48-1, Pitts Dep. 72:9-73:3).

The court concludes that Caldwell has created an issue of fact as to whether Pitts' reason for not rehiring him as an aluminum welder is pretextual. First, while the poor attendance record of a steel worker does not directly undermine Pitts' assertion that Caldwell's performance

46

problems served as the basis for his demotion, the fact that an employee with a poor attendance record was not demoted may be viewed as evidence that Pitts did not require top-notch performance from all its employees.  Second, Les Quay, the plant manager involved in the decision to demote Caldwell, has recognized that Caldwell complained before his demotion that he was having trouble with one of the aluminum welding machines because gas was on all the time, which resulted in black soot on the finished product.  (Doc. #32-11, Quay Aff. ¶ 6.)  Quay has also recognized that employees from the maintenance department attempted to fix the problem, and, after Caldwell was laid off, the gas shut off valve was replaced. (Id. at 7.)  While Quay testified that the problem could have no effect on Caldwell's welding, Caldwell has testified to the contrary.  Caldwell has testified that he complained to Quay that the aluminum floor welder was faulty and causing him to create welds that were sub-standard, but he was told to finish the job anyway.   Caldwell further testified that, when he returned to work, he protested to Quay that the sub-standard welds were not his fault, and Quay allegedly said, "No matter what you say, it's still your fault."  (Doc. #32-17, Caldwell Dep. 41:21-25.)  While the undisputed record evidence shows that the welding job Caldwell performed resulted in serious financial loss to Pitts, the reason for this financial loss, and the reason for Caldwell's demotion, is disputed. Third, the absence of a provision in the employee handbook for a reduction in pay if an employee is having performance issues is evidence that runs contrary to Pitts' argument that performance problems were the basis of the demotion.  Fourth, that Pitts cannot name anyone other than Gabriel Head and Timothy Caldwell who were given a pay reduction as discipline because of performance problems is evidence that undercuts Pitts' argument.  Finally, that two

white welders were hired to replace Caldwell as aluminum welder might be viewed as evidence that the demotion was not based on Caldwell's performance problems.

Accordingly, Pitts' Motion as to Caldwell's disparate treatment claim regarding his rehiring as an aluminum welder is due to be DENIED.

### 3.  Retaliation

Caldwell contends that he was "subject to retaliation by being written up by Les Quay when white employees complained to Quay that they did not want to work with Caldwell because of some 'basic issues.'"  (Doc. #67 at 83.)  Caldwell also asserts that Quay did not put a memo in the white employees' files stating Caldwell's observation that their complaints were motivated  by his complaining about his disparate pay and involvement in this lawsuit.  (Id. at 84-85.)

To establish a claim of retaliation under section 1981, "a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting  *Goldsmith v. Bagby Elevator Co.*, *Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

Pitts argues that Ware's retaliation claim must be dismissed because Caldwell has failed to show that he suffered materially adverse action.  Second, Pitts argues that there is no causal connection between the alleged adverse actions and statutorily protected activity.  That is, the complaints lodged by Caldwell's co-workers, which were recorded in a memo and placed in Caldwell's file, have no relation to Caldwell's involvement in this lawsuit or any other complaint Caldwell has made about race.  Pitts points out that Quay was not the manager when the

occurrences giving rise to the lawsuit occurred, as Quay took over as plant manger in or around August 15, 2009 (Doc. #32-1, Pitts Aff. ¶ 23), and the original Complaint in this lawsuit was filed March 6, 2009 (Doc. #1.)

The court concludes that Caldwell has failed to establish a prima facie case of retaliation. First, Quay's memorandum and his alleged failure to document Caldwell's opinion as to why employees were complaining about him do not constitute  "materially adverse action."  Les Quay's September 4, 2009 Memorandum was not a formal reprimand.  Rather, the memo is documentation of the meetings that Quay held to discuss Caldwell's employment relationships with other welders at the plant.  The memo states that Quay met with Wicker, Thompson, and Smith who all expressed concern over working with Caldwell because of his poor productivity, poor quality of work, and his tendency to "stir up trouble."  (Doc. #48-29, Less Quay Memo.) The memo continues to state that, after this meeting, Quay met with Caldwell to discuss the concerns raised by the other welders, and Caldwell denied that he posed any problems at the plant.  Quay told Caldwell that these issue cannot happen again, or else Caldwell will not be able to work at the plant.  The court cannot conclude that the presence of this document in a personnel file would be likely to dissuade a reasonable employee from making or supporting a charge of discrimination.  *See Davis*, 245 F.3d at 1240 (holding that job performance memoranda rarely constitute adverse employment actions).  Quay's decision to not write a memo stating Caldwell's observation that the other welders were complaining about him because of his involvement in this lawsuit is also not "materially adverse."

Second, Caldwell has failed to show that the allegedly adverse actions are causally related to his statutorily protected activity.  That several employees complained about Caldwell's

productivity, work quality, and working relationships has no causal relation to Caldwell's involvement in this lawsuit or any complaint Caldwell made about race, which Caldwell has not identified.  The memorandum was written over five months after this lawsuit was filed, and Quay had no prior involvement with any of the incidents forming the basis of this lawsuit.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection). Accordingly,  Pitts' Motion for Summary Judgment as to Caldwell's retaliation claim is due to be GRANTED.[13]

**D.  Claims of Plaintiff Gabriel Head**

Head has the following claims remaining for resolution:  (1)  hostile work environment; (2) disparate treatment in pay; (3) disparate treatment in discipline; and (4) retaliation in connection with the reduction in his pay to $8.50 per hour.  (Doc. #67 at 56-64.)[14]

**1.  Hostile Environment**

---

[13]  After two briefing opportunities, Caldwell has identified only two adverse employment actions forming the basis of his retaliation claim:  Quay's memo and Quay's failure to include Caldwell's comments in the personnel files of the other white workers.  Caldwell has not argued that his reduction in pay to $11.50, or his demotion to the steel welder position are retaliatory actions.

[14]  After two briefing opportunities to respond to Pitts' Motion for Summary Judgment, Head has failed to present any argument or evidence for the following claims:  (1) discrimination in overtime; and (2) retaliation for anything other than for the reduction in his pay to $8.50 per hour.  Consequently, Pitts' Motion for Summary Judgment as to these claims is due to be GRANTED.  *See Johnson v. Bd. of Regents of the Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001); *Fed. R. Civ. P.* 56(e).

Head's hostile environment claim is, for the most part, based on the events described in the facts section, and summarized in the discussion of Washington's hostile environment claim.[15]

Pitts makes many of the same arguments for dismissing Head's hostile environment claim as it did for dismissing the other hostile environment claims. The court has already concluded that these arguments are without merit in the context of Washington, Ware, and Caldwell's hostile environment claims.

Pitts does, however, point out several facts pertaining to Head's claim that warrant separate discussion. Pitts has submitted evidence that Head did not return to work at Pitts until October 10, 2008. (Doc. #32-15, Head Dep. 79:22-80:5.) Thus, Head does not appear to have been working at Pitts when the October 8, 2008 meeting took place, the meeting in which Williams used racial slurs. In his deposition, Head testified that he could not recall if he was employed at Pitts during the October 8 meeting. (Id. 95:14-24.) Nonetheless, Head has testified that he heard about what Williams said during the October 8 meeting, and has listened to a tape recording of the meeting (Id. 97:7-21, 100:7-10.) Head has further testified that he continued to hear Williams and Bryant refer to black employees as "them boys," and continued to see Confederate flag paraphernalia after the October 8 meeting. While the court recognizes that the severity of the October 8 meeting is lessened considering Head may not have been employed at the time, Head has submitted sufficient evidence that he was subjected to a

---

[15] Head also cites the evidence regarding his disparate treatment claims as evidence for his hostile environment claim. (Doc. #67 at 53). This is improper. *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (holding that discrete acts must be challenged as separate statutory discrimination and retaliation claims and cannot be brought as a hostile work environment claim); *Blalock v. Dale County Bd. of Educ.*, 84 F. Supp. 2d 1291, 1305 (M.D. Ala. 1999) (finding that Plaintiff cannot support a hostile environment claim with allegations that constitute classic examples of alleged disparate treatment).

substantially similar environment as Washington, Ware, and Caldwell.  Therefore, Head's purported October 10 starting date does not change the court's conclusion that Pitts' Motion for Summary Judgment as to Head's hostile environment claim is due to be DENIED.

## 2.  Disparate treatment in pay

Pitts argues that Head's disparate treatment in pay claim must be dismissed because Head has failed to produce sufficient evidence of pretext regarding its legitimate, non-discriminatory reasons for the reductions in pay.  Head's disparate treatment in pay claim is based on two separate reductions in his pay.[16]  Each is addressed in turn.

### a.  First reduction in pay ($13.50 per hour to $13.00 per hour)

Head began his employment at Pitts in November of 2007, at a rate of $13.50 per hour.  On May 27, 2008, Head's pay was reduced to $13.00 per hour.  Head claims this reduction was racially discriminatory.

To make out a prima facie case regarding discrimination in pay under section 1981, Head must establish that: (1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside his protected class received higher compensation; and (4) he was qualified to receive the higher wage.  *See Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004) (overruled on other grounds).

Head has identified the following white individuals as comparators because they had the same or less skill and were paid more than he was paid:  (1) Danny Harlow, (2) Clyde Wicker,

---

[16]  Head does not respond to Pitts' argument that it is entitled to summary judgment to the extent Head claims the rate of $13.50 per hour was itself discriminatory.  (Doc. #34 at 4-5.)  The court agrees with Pitts that Head has failed to state a prima facie case regarding this claim because he has failed to identify any valid comparators.  Accordingly, Pitts' Motion is due to be GRANTED as to this claim.

(3) Scott Smith, and (4) John Thompson. (Doc. #67 at 18; Doc. #32-15, Head Dep. 113:5-14, 114:2-23.)[17]  With this evidence, the court finds that Head has stated a prima facie case of disparate treatment in his pay reduction, as these four individuals all made more than $13.00 per hour and were similarly situated with Ware.

Pitts next argues that it had a legitimate, non-discriminatory reason for the reduction in pay.  Pitts has set forth three particular reasons for reducing Head's pay from $13.50 per hour to $13.00 per hour.  First, Pitts contends that Head was hired at an inflated rate of $13.50 per hour because Pitts had significant personnel needs at the time Head was hired in 2007, which gave those welders who had prior experience in the trailer industry, like Head, more bargaining power.  (Doc. #32-1, Pitts Aff. ¶ 22.).  The court finds that this reason does not legitimately explain the reduction in Head's pay.  The record indicates that several individuals were hired in 2007 at a rate of $13.50 per hour or more, namely the four comparators above, but these employees did not receive a later reduction in pay.  (Doc. #32-3.)  Thus, the fact that Head may have enjoyed an inflated pay rate when he was hired does not explain why his pay was reduced by fifty cents per hour when other employees who were also hired at an inflated rate did not have their rate reduced.  Accordingly, the court finds that this reason is insufficient to meet Pitts' burden of producing a legitimate, race-neutral reason for reducing Head's pay.

_____

[17]  Pitts contends that these individuals are not valid comparators because they did not have performance problems.  Because the issue of Head's poor job performance is intertwined with the issue of whether Pitts' nondiscriminatory reasons for the pay reduction are pretextual, Head's job performance is examined at the pretext stage of the *McDonnell Douglas* analysis. *See Vessels v. Atlanta Ind. School System*, 408 F.3d 763, 769 (11th Cir. 2005) (noting "that the prima facie case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession."); *Holifield v. Reno*, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997) (same).

Second, Pitts contends that Head's rate was reduced from $13.50 per hour to $13.00 per hour to ensure that Head did not make more money than his supervisor, Gary Ware. At some point, Jacobs placed Head under the supervision of Ware. Because Ware "was very sensitive about issues of pay," Pitts concluded "that it could have been offensive to [Ware] to be supervising an employee who was earning the same rate he was." (Doc. # 32-1, Pitts Aff. ¶ 29.) (Doc. #48-2, Jacobs Dep. 83:14-84:1.) The court finds that this particular reason for reducing Head's pay rate – to avoid a pay differential problem between Ware and Head – is insufficient to meet Pitts' burden of producing a legitimate, race neutral reason for reducing Head's pay. Pitts has not established that Head was the only employee under Ware's supervision who posed a pay differential problem. Based on the record, the pay differential problem could have been eliminated in multiple other ways besides taking the money from Head and giving it to Ware. As Head points out, no white welder had money taken from his pay and given to Ware, which could have also reduced the pay differential problem. Accordingly, the court finds that this reason – avoiding a pay differential problem between Head and Ware – is insufficient to meet Pitts' burden of providing a legitimate, race neutral reason for reducing Head's pay.

Third, Pitts argues that Head's rate was reduced to $13.00 per hour due to his poor work performance. Pitts, Hudson, and Breeden all testified that Head's work performance resulted in his reduction from $13.00 to $13.50. According to their testimony, Head was not as competent a welder as the other employees hired at the premium rate in 2007, was slower and less efficient, and lacked the ability to read blueprints well. (Doc. #34 at 7; Doc. #32-1, Pitts Aff. ¶ 35 (performance problems); Doc. # 32-12 , Hudson Aff. ¶ 41 (others could read blueprints); Doc. # 32-10, Breeden Aff. ¶ 10 (slower worker)). According to Jacobs, Head was incapable of laying

out a trailer and reading a measuring tape.  (Doc. # 32-13, Jacobs Depo. 83:14-19; 84:6-11.)

Jacobs told Head at the time of the pay cut that the reason for the pay cut was because he could

not read a blueprint.  (Doc. # 32-15, Head Depo. 66:25-67:4.)  The court finds that this reason –

Head's performance problems – is sufficient to meet Pitts' burden of providing a legitimate, race

neutral reason for reducing Head's pay.

　　　　To satisfy his burden of showing Pitts' reason is but pretext for discrimination, Head has

produced the following evidence: (1)  Billy Copeland, Head's supervisor, never wrote Head up

for any performance problems, which he would be required to do if someone was having

performance problems (Doc. #67 at 18; Doc. #48-5, Copeland Dep. 48:11-20.)[18];  (2) There is no

provision in Pitts' Progressive Disciplinary Policy for a reduction in pay if an employee is

having performance or disciplinary issues.  (Doc. #67 at 17; Doc. #48-15 at 27-28.);  (3)  Jeff

Pitts praised Head and Ware's welding just before Head's demotion in pay.  (Doc. #32-15, Head

Dep., 142:24-143:8; Doc. #32-16, Ware Dep. 115:8-117:4); (4)  Pitts cannot name anyone other

than Head and Caldwell who were given a pay reduction as discipline because of performance

problems.  (Doc. #48-1, Pitts Dep. 72:9-73:3.); (5) The circuitous manner in which Pitts

informed Head as to why his pay was reduced. (Doc. #67 at 16-17.)

　　　　Based on the foregoing evidence, the court concludes that Head has submitted sufficient

evidence to create an issue of fact as to whether Pitts' reason for reducing his pay – Head's poor

---

[18]  The court recognizes that the record contains conflicting evidence regarding the
documentation of Head's performance problems.  While Head has submitted evidence that his
supervisor, Copeland, did not write him up for performance problems, Pitts has submitted
evidence that Jeff Pitts and Danny Jacobs noted such problems in Head's personnel file.  (Doc.
#32-1, Pitts Aff. Ex. A.)

performance – is pretextual.  Thus, Pitts' Motion for Summary Judgment as to Head's $13.50-to-$13.00 reduction in pay is due to be DENIED.

**b.  Second reduction in pay ($13.00 per hour to $8.50 per hour)**

In its opening brief, Pitts moved for summary judgment as to Head's claim that his reduction in pay from $13.00 per hour to $8.50 per hour was discriminatory.  Pitts submitted evidence showing that Head's reduction in pay from $13.00 to $8.50 was the result of Head's rude and impertinent conduct he displayed after the $13.50-to-$13.00 reduction.  According to Jeff Pitts, Head told Pitts that he was going to get his fifty cents back "in a manner that was rude and impertinent, and, frankly, borderline threatening."  (Doc. #32-1, Pitts Aff. ¶ 35.)

In Head's response brief (Doc. #67), he does not address the $13.00 to $8.50 reduction in pay.  In particular, Head points to no evidence that Pitts' legitimate, race-neutral reason for the reduction – his impertinent and threatening conduct – is but pretext for discrimination.  Thus, Pitts' Motion for Summary Judgment as to Head's $13.00-to-$8.50 reduction in pay claim is due to be GRANTED.  *See Celotex Corp.*, 477 U.S. at 324 (non-movant must designate facts showing there is a question of fact for trial).

**3.  Disparate treatment in discipline**

Head's claim for disparate treatment in discipline is difficult to discern.  Head has provided the following factual allegations:  Mike Lawson, a white employee at Pitts, left work without clocking out in order to get pills for Billy Copeland, a white supervisor.  (Doc. #32-15, Head Dep. 118:7-16.)  Head complained to Bill Breeden, a white plant manager, about the Copeland-Lawson arrangement, and Breeden told Head not to talk to Copeland.  After Head complained to Breeden, Head was laid off sometime in February of 2009 and recalled to work in

April 2009.  Head contends he was laid off as a result of reporting Copeland's drug use, and Head notes that Mike Lawson was not laid off.

Based on these factual allegations, the court understands Head to be arguing that he was discriminated against when he was laid off.  Assuming that Head can state a prima facie case, the court finds that Pitts has submitted a legitimate, race-neutral reason for laying Head off.  Pitts has produced evidence that it laid Head off in order to lower costs in February 2009 due to reduced order volume.  (Doc. #32-1, Pitts Aff. ¶ 41.)  Pitts also notes that eleven welders were laid off in February 2009, and nine of the eleven were white and two were black.  (Doc. #32-2, Hammett Aff. ¶ 30.)  Head has pointed to no evidence of pretext regarding this reason, and has not argued any hostile environment evidence as evidence of pretext for this claim.  Because Head has pointed the court to no evidence of pretext to rebut Pitts' legitimate, race-neutral reason for the layoff, Pitts' Motion as to Head's discriminatory layoff claim is due to be GRANTED.

**4.  Retaliation**

Head alleges that Pitts retaliated against him for complaining about his reduction in pay.  To establish a claim of retaliation under section 1981, "a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). Head asserts that he complained about having fifty cents per hour deducted from his pay, and Pitts retaliated against him for complaining by further reducing his pay to $8.50 per hour and assigning him to cut grass out in front of the plant.

Pitts contends that Head cannot state a prima facie case of retaliation in connection with his pay cut because he did not engage in statutorily protected activity.  Pitts particularly contends that Head's complaints to management before his pay cuts had nothing to do with his race, and thus those complaints do not qualify as "statutorily protected activity."

The court concludes that Head has failed to establish a prima facie case of retaliation because he has failed to show that he engaged in statutorily protected activity.  According to Head's own deposition testimony, he never mentioned anything about race in his complaints prior to his pay cuts.  (Doc. #32-15, Head Dep. 65:5-66:15, 68:16-69:4.)  That Head complained of general unfair treatment in having his rate reduced by fifty cents does not constitute statutorily protected activity.  *See Coutu v. Martin Co. Bd. of Co. Comm'r.*, 47 F.3d 1068, 1074 (11th Cir. 1995) (noting that complaints of unfair treatment, without any reference to discrimination based on a protected characteristic, do not constitute statutorily protected activity).  Accordingly,  Pitts' Motion for Summary Judgment as to Head's retaliation claim is due to be GRANTED.

## V.  CONCLUSION

Defendant Pitts Enterprises, Inc.'s Motion for Summary Judgment (Doc. # 32) is GRANTED in part and DENIED in part as follows:

Summary Judgment is DENIED as to the following claims.

(A)  Hennis Washington

    (1)  The Motion is DENIED as to Washington's hostile environment claim.

(B)  Gary Ware

    (1)  The Motion is DENIED as to Ware's hostile environment claim.

    (2)  The Motion is DENIED as to Ware's failure to promote claim.

(C)  Timothy Caldwell

(1)  The Motion is DENIED as to Caldwell's hostile environment claim.

(2)  The Motion is DENIED as to Caldwell's disparate treatment claim regarding his rehiring as an aluminum welder.

(D)  Gabriel Head.

(1)  The Motion is DENIED as to Head's hostile environment claim.

(2)  The Motion is DENIED as to Head's disparate treatment claim regarding the $13.50-to-$13.00 reduction in pay.


Summary Judgment is GRANTED and Judgment is entered in favor of Pitts Enterprises Inc.,  and against Gabriel Head, Gary Ware, Hennis Washington, and Timothy Caldwell, as to all other claims.

This case will proceed to trial on the hostile environment claims of all four Plaintiffs, Ware's failure to promote claim, Caldwell's disparate treatment claim regarding his rehiring as aluminum welder, and Head's disparate treatment claim regarding the $13.50-to-$13.00 reduction in pay.

DONE this 14th day of July, 2010.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE